UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X
YUEN SHING LEE,                        :
                                       :                PRO SE
              Petitioner,              :
                                       : 05 Civ. 05844 (JSR)(THK)
        -against-                      :
                                       :
                                       :              **REPORT**
UNITED STATES OF AMERICA,              :  **AND RECOMMENDATION**
                                       :
              Respondent.              :
--------------------------------------X
**FROM:  THEODORE H. KATZ, United States Magistrate Judge.**
**TO:    HON. JED S. RAKOFF, United States District Judge.**

Petitioner Yuen Shing Lee ("Petitioner") has petitioned the
Court, pursuant to the All Writs Act, 28 U.S.C. § 1651, for a writ
of coram nobis or audita querela vacating or reducing the order of
restitution issued as part of his 1999 judgment of conviction,
which stemmed from Petitioner's guilty plea to four counts of mail
fraud and one count of conspiracy to commit mail fraud.  As a
result of his plea, and the restitution amount ordered at his
sentencing hearing, Petitioner's offense constituted an aggravated
felony under the Immigration and Nationality Act ("INA"), and, as
a result, Petitioner has been ordered removed from the United
States.  Petitioner now argues that, in the interests of justice,
in order to alleviate the adverse immigration consequences of the
order of restitution, the restitution amount should be reduced to
less than $10,000, because: 1) the restitution amount of $115,558
was improper; 2) his counsel was ineffective because he failed to
challenge the restitution amount and misadvised Petitioner that his

guilty plea would not result in his deportation; and 3) the Chinese Consular Office was not notified of his arrest, in violation of Article 36 of the Vienna Convention on Consular Relations ("VCCR") and the 1997 bilateral treaty between the United States and the People's Republic of China. (See Petitioner's Memorandum of Law in Support of Amended Petition, dated Dec. 23, 2005 ("Pet'r Br."), at 11-29.)   Respondent argues, among other things, that the restitution amount that was ordered at sentencing was proper, that Petitioner's arguments based on ineffective assistance of counsel and Vienna Convention violations are meritless, and that any attempt by this Court to arbitrarily adjust the restitution amount to prevent Petitioner's deportation would raise separation of powers concerns. (See Respondent's Opposition to Petitioner's Amended Petition, dated Nov. 10, 2005 ("Resp't Opp. Br.").)

This action was referred to this Court for a Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72.1(d) of the Southern District of New York Local Civil Rules.   The Court finds that Petitioner's claims are meritless, and, accordingly, recommends that the Petition be denied and the case be dismissed in its entirety.

## BACKGROUND

A.   <u>Conviction and the Underlying Offense</u>

Petitioner, born in British-controlled Hong Kong in 1961, entered the United States at age eleven as a lawful permanent

resident. (See Pet'r Br., at 1.)  Petitioner has never left the United States since that time. (See id. at 2; Declaration of Yuen Shing Lee, dated June 22, 2005 ("Lee Decl."), Ex. A to Amended Petition for Writ of Coram Nobis and Writ of Audita Querela ("Am. Pet."), ¶ 39.)  Though he was never naturalized, Petitioner's parents, as well as his wife, children, and grandchildren, are all citizens of the United States.

In October of 1998, Petitioner was arrested for his role in a scheme in which several employees of the New York City Department of Environmental Protection ("DEP") entered DEP computers and altered customers' water bills in exchange for payments amounting to a portion of the total water bill reduction. (See Pet'r Br., at 3; New York City Department of Investigation Press Release, dated Aug. 16, 1999 ("DOI Press Release"), Ex. D to Pet'r Br.) Petitioner's role in the conspiracy was to find customers who were willing to pay money to have their water bills reduced, and to facilitate payment and other arrangements in furtherance of the scheme. (See Pet'r Br., at 3; Lee Decl. ¶ 21; Pre-Sentence Investigation Report and Sentencing Recommendation, dated Aug. 19, 1999 ("PSR"), Ex. F to Pet'r Br., ¶¶ 34-41.)

Upon his arrest, Petitioner's Hong Kong travel documents, with which he had entered the United States almost thirty years earlier, were confiscated. (See Pet'r Br., at 3; Lee Decl. ¶ 23.)  Despite a treaty agreement signed by the United States and China, mandating

that law enforcement authorities inform the Chinese consulate within four days of the arrest or detention of any Chinese national — including nationals of the Hong Kong Special Administrative Region — and immediately inform the national of his or her right to communicate with a consular officer, Petitioner contends that neither treaty requirement was met. (See Pet'r Br., at 4; Supplemental Declaration of Yuen Shing Lee, dated Oct. 24, 2005 ("Lee Supp. Decl."), Ex. C to Am. Pet., ¶¶ 5-6.)  At Petitioner's first court appearance, he was told by his court-appointed attorney that, since he was not a citizen, he could face deportation. (See Pet'r Br., at 4; Lee Decl. ¶ 24.)  Petitioner subsequently hired a private defense attorney, Mr. Patrick Brackley. (See Pet'r Br., at 4; Lee Decl. ¶ 25.)  According to Petitioner, Mr. Brackley advised Petitioner that he "did not face deportation," see Lee Decl. ¶ 26, a point which Mr. Brackley vehemently contests. (See Declaration of Patrick Brackley, dated Oct. 21, 2005 ("Brackley Decl."), Ex. B to Resp't Opp. Br., ¶¶ 4-6.)

On June 4, 1999, after consulting with Mr. Brackley and on his recommendation, Petitioner pleaded guilty to four counts of mail fraud, in violation of 18 U.S.C. § 1341, and one count of conspiracy to engage in mail fraud, in violation of 18 U.S.C. § 371. (See PSR, at 1.)  At the plea hearing, Petitioner admitted under oath to telling customers that his "friend could help them out" with their water bills, and that customers would pay him cash

in exchange for the reduced water bills. (See Resp't Opp. Br., at 8.)  In addition, Petitioner replied in the affirmative when asked whether he was satisfied with his attorney's representation, and whether he understood that the District Court "may order a defendant to make restitution to any victim of the offense." (See id.)  Satisfied with Petitioner's responses at the plea hearing, then-Magistrate Judge Naomi Reice Buchwald recommended that the District Court accept Petitioner's guilty plea. (See id.)

On September 23, 1999, Lee appeared before the District Court (Rakoff, J.) for sentencing.  Petitioner was sentenced to six months of imprisonment, six months of home detention, three years of supervised release, and a $500 mandatory special assessment. The Court also held Petitioner jointly and severally liable for restitution to the DEP in the amount of $115,558. (See Resp't Opp. Br., at 11-12; Pet'r Br., at 1.)  At his sentencing, Petitioner stated that he had read the PSR "personally," and that he had also discussed it with his attorney, Mr. Brackley. (See Resp't Opp. Br., at 9.)  While the PSR did not provide a detailed accounting of how it came to the restitution amount of $115,558, which was referred to several times in the PSR, it did describe that figure as the "amount of loss to the DEP . . . which has been attributed to the defendant." (PSR ¶¶ 41, 42, 49, 95.)  Neither Petitioner nor his counsel objected to the restitution amount at any point in the hearing, even after the Court asked explicitly whether there was

any disagreement with the restitution amount of $115,588. (See Resp't Opp. Br.)[1]

Judgment was entered on September 24, 1999. (See Judgment, United States v. Yuen Lee, 98 Cr. 1443 (JSR), Sept. 24, 1999.) Petitioner did not challenge any aspect of his sentence, including the restitution amount, on direct appeal.

B.   Post-Conviction Procedural History

On May 5, 2000, upon completion of his six-month term of imprisonment, a Notice to Appear was issued by the immigration authorities and Petitioner was charged with removability under Section 237(a)(2)(A)(iii) of the INA, as an alien having been convicted of an "aggravated felony." (See Am. Pet. ¶ 19.) Petitioner appeared before an Immigration Judge in Louisiana, who ordered on April 27, 2001, that Petitioner be removed to Hong Kong. (See Transcript of Immigration Proceedings, Ex. A to Resp't Opp. Br., at A297.)   The Immigration Judge relied on the fact that, having pled guilty to an offense involving fraud in which the loss to the victim exceeded $10,000, Petitioner's conviction constituted an aggravated felony under the INA, mandating Petitioner's deportation.[2] (See id. at A292, A297.)   Petitioner's appeal was

---

[1] As transcripts of the plea and sentencing hearings are unavailable, the Court relies on the parties' representations regarding what took place.  The facts set forth regarding these hearings are not in dispute.

[2] Under INA § 101(a)(43)(M)(I), unlike most other offenses, including theft offenses, an offense involving fraud is deemed an

denied by the Board of Immigration Appeals.

On November 30, 2000, more than a year after his conviction became final, Petitioner, acting pro se, filed a habeas corpus petition pursuant to 28 U.S.C. § 2255, seeking to vacate his sentence on the ground that he received ineffective assistance of counsel because his attorney failed to inform him of the immigration consequences of pleading guilty.[3]  This Court issued a Report and Recommendation on August 5, 2002, recommending denial of Petitioner's claim as both untimely and without merit, and the Report was adopted by the District Court by Order dated August 29, 2002. (See Report and Recommendation, dated August 6, 2002 ("R & R"); Order adopting Report and Recommendation, dated August 30, 2002.)

On February 13, 2001, Petitioner filed a writ of habeas corpus in the United States District Court for the Eastern District of New

---

aggravated felony if the loss to the victim is calculated to be over $10,000, regardless of the term of imprisonment. See 8 U.S.C. § 1101(a)(43)(M)(i).

[3] Petitioner's habeas petition argued that his counsel was ineffective because he failed to warn Petitioner that he may face deportation as a result of his guilty plea.  As this Court noted, that argument is squarely in conflict with well-established precedent in this Circuit.  The absence of a warning, from court or counsel, that deportation proceedings may follow a guilty plea, neither renders a plea involuntary nor counsel's assistance ineffective. (See R & R, at 3-4.)  As part of the instant Petition, Petitioner argues not that his counsel was ineffective for failing to inform him that he might be deported, but instead that he was ineffective for affirmatively misrepresenting to Petitioner that he would not face deportation as a result of his guilty plea. (See Am. Pet. ¶ 31.)

York, challenging his removal order. The court granted Petitioner's habeas petition on the grounds that he was a national of the United States under the INA, and hence could not be deported. See Lee v. Ashcroft, 216 F. Supp. 2d 51 (E.D.N.Y. 2002), vacated, 268 F. Supp. 2d 150 (E.D.N.Y. 2003), reinstated, No. 01 Civ. 0997 (SJ), 2003 WL 21310247 (E.D.N.Y. May 27, 2003). On August 8, 2005, by summary order, the Second Circuit reversed and remanded with instructions to dismiss the petition. See Lee v. Ashcroft, No. 03-2522L, 142 Fed. Appx. 503, 2005 WL 1865423, at *1 (2d Cir. 2005). A motion for rehearing and rehearing en banc is currently pending. (See Resp't Opp. Br., at 14-15; Am. Pet. ¶ 24.) However, that motion has been stayed by the Second Circuit, pending resolution of the instant action regarding the underlying criminal case. (See Petitioner's Letter to the Court, dated Nov. 14, 2006 ("Pet'r Letter"), at 1.)

C.    The Instant Petition

Petitioner filed the instant action on June 23, 2005, and an Amended Petition on November 1, 2005, arguing that he meets the requirements for the grant of a writ of coram nobis, or alternatively, for a writ of audita querela. Petitioner seeks to have the restitution amount of $115,558, imposed at his sentencing hearing, vacated or reduced to below $10,000, which would result in his conviction offense no longer qualifying as an "aggravated felony" under the INA, thus freeing Petitioner from being subject

8

to removal.

## DISCUSSION

I.   Writ of Coram Nobis

"Coram nobis is an 'extraordinary remedy' authorized under the All Writs Act, 28 U.S.C. § 1651(a)."[4] Porcelli v. United States, 404 F.3d 157, 158 (2d Cir. 2005); see also Foont v. United States, 93 F.3d 76, 78 (2d Cir. 1996) ("A district court may issue a writ of coram nobis . . . where extraordinary circumstances are present.") (internal quotations omitted).  It is "essentially a remedy of last resort for petitioners who are no longer in custody pursuant to a criminal conviction and therefore cannot pursue direct review or collateral relief by means of a writ of habeas corpus." Fleming v. United States, 146 F.3d 88, 89-90 (2d Cir. 1998).  However, the writ is "not a substitute for appeal, and relief under the writ is strictly limited to those cases in which errors of the most fundamental character have rendered the proceeding itself irregular and invalid." United States v. Mandanici, 205 F.3d 519, 524 (2d Cir. 2000) (internal quotation marks omitted); accord Foont, 93 F.3d at 78; see also Chacko v.

---

[4] The All Writs Act, 28 U.S.C. § 1651, provides:

(a) The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

(b) An alternative writ or rule nisi may be issued by a justice or judge of a court which has jurisdiction.

United States, Nos. 04 Civ. 2258 & 96 Cr. 0519 (JGK), 2005 WL 1388713, at *4 (S.D.N.Y. June 8, 2005).  Moreover, the petitioner bears the burden of overcoming a presumption of correctness in the proceedings leading to conviction.  See Foont, 93 F.3d at 79 (citing United States v. Morgan, 346 U.S. 502, 512, 74 S. Ct. 247, 253 (1954)).

To obtain coram nobis relief, Petitioner "must demonstrate that 1) there are circumstances compelling such action to achieve justice, 2) sound reasons exist for failure to seek appropriate earlier relief, and 3) the petitioner continues to suffer legal consequences from his conviction that may be remedied by granting of the writ."  Fleming, 146 F.3d at 90 (internal quotation marks and citations omitted); accord Chacko, 2005 WL 1388713, at *2.

As an initial matter, the Court notes that the bulk of Petitioner's briefing addresses the first of the three coram nobis requirements, and justifiably so given the writ's exacting standard.  However, while the Court agrees that Petitioner clearly satisfies the third prong of the coram nobis test, facing deportation as a result of his sentence, it is less apparent that Petitioner has established sound reasons for failing to seek appropriate relief earlier.  Petitioner was sentenced over seven years ago, and did not challenge his restitution order on direct appeal, although he clearly could have done so.  Petitioner notes that he could only have brought a writ of coram nobis, challenging

his restitution order, after May of 2003;[5] however, Petitioner could have brought a habeas corpus petition, seeking to vacate his plea, over the entire seven year period.[6]  Indeed, in an earlier habeas petition, Petitioner did exactly that, contending that his attorney was ineffective for failing to advise him of the possible consequences of his plea.   In the instant Petition, Petitioner argues that his attorney affirmatively misadvised him that he would not be deported as a result of his plea.   In either case, the appropriate remedy for ineffective assistance of counsel would be to vacate the entire plea, including the restitution order, but

---

[5]  Petitioner reasons that habeas relief is the remedy that is available to a criminal defendant in custody, and that "custody" includes any period of supervised release. (See Pet'r Br., at 8-9.)  Here, Petitioner was sentenced to three years of supervised release after his six-month period of imprisonment, meaning he would have technically been in "custody" until May, 2003.

[6] Although it is true that a challenge to a restitution order cannot be lodged in a collateral attack upon a sentence through a writ of habeas corpus, it is not at all clear that Petitioner could not have brought a writ of coram nobis challenging his restitution order while he was in custody, and hence over the entire seven year period.  In Kaminski v. United States, 339 F.3d 84 (2d Cir. 2003), the court held that a criminal defendant could not challenge non-custodial aspects of his sentence through a habeas corpus petition, even if such a challenge was made in conjunction with a challenge to imprisonment. Id. at 88-89.  In Kaminski, in a further discussion not joined by Chief Judge Walker and Judge Leval, Judge Calabresi opined that a writ of coram nobis would not be barred if used to challenge a restitution order even if the petitioner was still in custody. See id. at 90, n.4.  According to Judge Calabresi, such a holding would be "congruen[t]" with the Court's reasoning and part of an "elegant symmetry" between habeas corpus and the other modes of challenging punishment. Id. at 90-91, n.4.

11

that is not the relief Petitioner seeks here.  The fact that Petitioner has pursued other remedies — including several habeas petitions, one of which was before this Court — is irrelevant, as a legal matter, as to his failure to challenge his restitution order until now.[7]  Out of an abundance of caution, the Court will nonetheless consider Petitioner's arguments under the first prong of the test for a writ of coram nobis.

In support of his request for a writ of <u>coram</u> <u>nobis</u>, Petitioner presents three primary arguments as to why this extraordinary writ is required to achieve justice in the instant case: 1) the loss figure of $115,558 in the PSR failed to reflect the <u>actual loss</u> to the victim, and was an improper basis for determining the restitution amount at sentencing; 2) Petitioner's attorney, by misinforming Petitioner that he would not face deportation as a result of his conviction, and neglecting to take various actions that would have mitigated such severe immigration consequences, was ineffective; and 3) Petitioner would have avoided such severe immigration consequences — presumably by refusing to plead guilty or by retaining an attorney specializing in

---

[7] In addition, with the exception of Petitioner's ineffective assistance of counsel claim arguing that his attorney affirmatively misrepresented the likelihood of deportation as a result of his plea and conviction, which the Court addresses and rejects below for other reasons, the Court is unconvinced that Petitioner's claims demonstrate the existence of "fundamental errors" that render his sentence "irregular and invalid," thus warranting <u>coram</u> <u>nobis</u> relief.

immigration matters — if the Chinese consulate had been informed of his arrest, in accordance with the provisions of the Vienna Convention on Consular Relations and the 1997 US-China Bilateral Treaty. (See Pet'r Br., at 11-29.)  The Court finds these arguments unpersuasive.

A.   Challenge to the Restitution Amount

Petitioner's first argument squarely raises the threshold question in this case — whether there is a sound basis to reduce the restitution amount to less than $10,000.  As discussed below, Petitioner's ineffective assistance of counsel and Vienna Convention claims are dependent upon an affirmative answer to this question.  More fundamentally, where Petitioner essentially seeks, in the interests of justice, to have his restitution reduced to a figure that would prevent his deportation, an extraordinary writ such as coram nobis cannot lie in the absence of a basis for such a reduction, for there would effectively be no justice to be had. Here, more than seven years after his sentencing hearing, no part of which he ever challenged on direct appeal, Petitioner fails to provide competent evidence to support vacating or reducing the restitution amount.

The restitution amount of $115,558 was taken from the PSR, which describes this figure as "the amount of loss to the DEP, all of which is attributable to the defendant." (PSR ¶ 42.)  Petitioner stated at sentencing that he had personally reviewed the PSR, which

13

listed the restitution amount no less than four separate times, and had gone over it with his attorney. (See Resp't Opp. Br., at 10; PSR ¶¶ 41, 41, 49, 95.)  When asked whether there was "any disagreement with the restitution amount," neither Petitioner nor his counsel raised any objection. (See Resp't Opp. Br., at 10; Pet'r Br., at 19.)  Moreover, Petitioner did not challenge his restitution order for almost six years from the time of his sentence, and five years from the time he was taken into custody by the then-Immigration and Naturalization Service ("INS"), which is when he claims to have first realized he would face deportation as a result of the restitution order.[8]

Despite numerous opportunities to challenge the restitution portion of his sentence, Petitioner now argues that the restitution order should be vacated or reduced because the government failed to present sufficient evidence in support of the $115,558 figure. Petitioner contends that the amount of restitution attributable to his contribution to the fraudulent scheme should only be for the substantive counts to which he pled guilty, and further contends

---

[8] Petitioner would have had an incentive to correct any error in his restitution amount regardless of whether he knew, at the time of his sentencing hearing, that immigration consequences could arise from the resulting determination.  In fact, upon the belief that he would return to his family in the United States upon the completion of his prison term, at which time he would be required to make mandatory payments toward fulfilling his restitution obligation, Petitioner should have had an incentive to challenge the restitution amount if he felt it was inaccurate.

that the restitution amount does not reflect <u>actual loss</u> to the victim, as required by the statute, since it is unclear whether the figure was adjusted for amounts restored to the DEP. (<u>See</u> Pet'r Br., at 11-16; Pet'r Letter, at 2.)   These arguments are without merit.

As an initial matter, Petitioner's suggestion that the $115,558 figure is erroneous, because it includes amounts which cannot be specifically attributed to water bill reductions associated with the four substantive counts for which he pled guilty, simply does not comport with the law.  Under the Mandatory Victims Restitution Act ("MVRA"), where a defendant has been found guilty for his role as part of a scheme or conspiracy, he can be held liable for the full amount of loss to the victims, including losses attributed to specific substantive counts for which that particular defendant was not charged or convicted.[9] See United States v. Boyd, 222 F.3d 47, 50-51 (2d Cir. 2000) (holding that the MVRA "provide[s] for restitution payable by all convicted co-

---

[9] While Petitioner is correct that the MVRA was intended to make victim's whole, and does not authorize windfall payments to victims, the law is clear that co-defendants can each be held liable for the full amount of the victim's losses, jointly and severally. See United States v. Boccagna, 450 F.3d 107, 115, 117 (2d Cir. 2006) (noting that primary purpose of MVRA is to make victims of crimes whole, and that the MVRA does not permit awards "in excess of the amount of the victim's loss.") (internal citations omitted); United States v. Nucci, 364 F. 3d 419, 422 (2d Cir. 2004) (where defendant was sentenced to pay entire loss while co-defendants were required to pay portions of same loss, court held "[i]t has long been the law of this circuit that the restitution obligation may be ordered to be joint and several").

conspirators in respect of damage suffered by all victims of a conspiracy, regardless of the facts underlying counts of conviction in individual prosecutions," and specifically stating that the MVRA permits courts to "order a participant in a conspiracy to pay restitution even on uncharged or acquitted counts . . . ."); see also United States v. Oladimeji, 463 F.3d 152, 159 (2d Cir. 2006). Here, Petitioner was not held responsible for the entire conspiracy, though the district court appears to have had authority to do so; rather, his $115,558 restitution figure only reflects losses attributed directly to his conduct.

Petitioner is correct that the restitution amount should reflect actual loss to the victim, providing an offset for any property returned to the victim. See 18 U.S.C. § 3663A(b)(1)(B) (indicating that court's calculation of restitution must take into account any portion of property that has already been returned to victim); United States v. Catoggio, 326 F.3d 323, 328-29 (2d Cir. 2003) (confirming that restitution orders must reflect "actual losses"). However, Petitioner has provided no competent evidence indicating that the $115,558 restitution amount at the time of sentencing failed to account for amounts restored to the DEP. Petitioner relies exclusively upon a Department of Investigations press release from August 16, 1999, stating that the DEP had "corrected and restored water billings, totaling $2.1 million, to more than 150 customers." (See Pet'r Br., at 14; DOI Press

16

Release.)  Without more, this statement is, at best, ambiguous. Though the press release states that $2.1 million was restored to customer accounts, it also states that the entire water bill scheme defrauded the government out of $800,000.  Rather than suggesting that the $2.1 million was not offset against actual losses, more logically the statement appears to indicate that even after restoring $2.1 million to customer accounts, the DEP lost $800,000 as a result of the scheme.  Indeed, Petitioner appears to recognize the flimsiness of this single piece of evidence.  Instead of arguing that this statement proves there were amounts restored to the DEP which were not considered in calculating restitution, Petitioner merely argues that "the record does not reflect that this information was accounted for in calculating the actual loss to the DEP . . . ." (Pet'r Br., at 14 (emphasis omitted)).  At this late date, where Petitioner has failed to raise this argument for seven years since the time of sentencing, the burden rests with Petitioner, not the government, to prove that the restitution amount was improper.[10] See Foont, 93 F.3d at 79 ("The proceedings leading to the petitioner's conviction are presumed to be correct, and the burden rests on the accused to show otherwise." (citing Morgan, 346 U.S. at 512, 74 S. Ct. at 253) (internal quotations

---

[10] At the time of sentencing, the government bears the burden of establishing, by a preponderance of the evidence, the proper restitution amount. See 18 U.S.C. § 3664(e).  Where the amount is not challenged at the time of sentencing, the district court's award is reviewed for plain error. See Boyd, 222 F.3d at 49.

17

omitted)).

In any event, Petitioner's contention that the actual loss attributable to him did not exceed $10,000 is belied by other evidence in the PSR. First, every one of Petitioner's co-defendants who had already been sentenced, with restitution ordered as part of his or her sentence, was ordered to pay restitution in excess of $10,000. (See PSR ¶¶ 1-21.)[11] Petitioner argues that the only evidence in the PSR supportive of a restitution order against him are his statement that he received $7,000 in gifts for his role in the scheme, and that, for the one account listed in the PSR for which he pled guilty to a substantive offense, the water bill was reduced by $5,339. Under the circumstances presented here, the amount Petitioner received is irrelevant to the loss suffered by the DEP. Moreover, the PSR clearly states that Petitioner provided his co-defendant with five account numbers, "with the request that [co-defendant] either reduce or eliminate the corresponding water bills." (PSR ¶ 41.) The five accounts held an aggregate account balance of $115,558. (See id.) Moreover, in addition to the $5,339 reduction mentioned above, the PSR also alludes to an instance in which Petitioner reduced an account balance by $6,700-6,800, and

---

[11] Of the subset of individuals sentenced to some period of imprisonment, the restitution amounts ranged from $790,240 (and 63 months in prison) to a minimum of $34,000 (and 3 days in prison). (See PSR ¶¶ 3, 6, 14.) Moreover, the only other individual who, like Petitioner, received a sentence including six months imprisonment, was ordered to pay restitution in the amount of $52,844. (See PSR ¶ 17.)

another reduction of at least $1,900. (See PSR ¶¶ 36, 39.)
Finally, as part of the pre-sentence interview to assess
Petitioner's acceptance of responsibility for his crime, he
acknowledged collecting $33,500 in cash from four customers as part
of his role in the scheme. (See PSR ¶ 44.)[12]  For all of these
reasons, Petitioner has failed to establish compelling
circumstances of injustice so as to justify reducing Petitioner's
restitution order to less than $10,000.  See Oladimeji, 463 F.3d at
160 (declining to vacate restitution order where defendant
"offer[ed] nothing but conjecture as to the possibility that [the
victim] might have recovered a part of the loan").

These infirmities in the Petition highlight a more fundamental
problem with Petitioner's request for relief.  It is apparent that
Petitioner's request that his restitution amount be reduced to less
than $10,000 is not based on evidence, but is instead based on a
desire to avoid the immigration consequences of his plea.  The
Court lacks the authority to arbitrarily reduce the restitution
amount.  Moreover, any adjustment to the restitution amount solely
for purposes of preventing what the Court concedes are draconian
immigration consequences in the instant case, must be ignored by

---

[12] According to one news report, provided by Petitioner, the
defendants "collected payoffs as high as forty percent of the
water bills owed." (See Article in Newsday, dated Oct. 22, 1998,
Ex. E to Pet'r Br.)  At a forty percent rate, Petitioner's
receipt of $33,500 in cash would equate to a reduction in water
bills of $83,750.

the immigration judge and the Board of Immigration Appeals in determining whether the loss to the victim exceeded $10,000. See United States v. Shaikh, 98 Cr. 1238-03 (SAS), 2006 WL 2347829, at *2 (S.D.N.Y. Aug. 11, 2006) ("[W]hen the amount of restitution is not based on a finding as to the amount of the loss but is instead intended solely to affect the defendant's immigration status, the amount of restitution is not controlling." (quoting Munroe v. Ashcroft, 353 F. 3d 225, 227 (3rd Cir. 2003))); Conteh v. Gonzales, 461 F.3d 45, 61-62 (1st Cir. 2006) (relying on Munroe for proposition that "when a restitution award has been artificially manipulated for the sole purpose of influencing an alien's immigration status, that award is not controlling with respect to the amount of loss").

B.   Ineffective Assistance of Counsel

Petitioner argues that his trial counsel was ineffective because 1) he made affirmative misrepresentations about the immigration consequences of Plaintiff's plea by stating that Petitioner would not be deported, and 2) he failed to take steps to mitigate the severe immigration consequences of the restitution order. (See Pet'r Br., at 17-25.)  These arguments are meritless.

To establish a claim of ineffective assistance of counsel, a petitioner must demonstrate (1) that his counsel's performance was deficient, and (2) that counsel's deficient performance prejudiced the petitioner. See Strickland v. Washington, 466 U.S. 668, 687,

20

104 S. Ct. 2052 (1984); accord Lanfranco v. Murray, 313 F.3d 112, 118 (2d Cir. 2002); Aparicio v. Artuz, 269 F.3d 78, 95 (2d Cir. 2001).  The performance of counsel is deficient if it "[falls] below an objective standard of reasonableness" under "prevailing professional norms." Strickland, 466 U.S. at 688, 104 S. Ct. at 2064-65; Lanfranco, 313 F.3d at 118.  In addition, a petitioner must show that the deficiency had an effect on the result and that the error was prejudicial to the petitioner. See id. at 691-96.  A petitioner demonstrates prejudice by "showing that counsel's errors were so serious as to deprive the defendant of a fair trial," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 687, 694; 104 S. Ct. at 2064, 2068; see also Aparicio, 269 F.3d at 95; Flores v. Demskie, 215 F.3d at 293, 300 (2d Cir. 2000).  "Reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome" of the proceeding.  Strickland, 466 U.S. at 694; 104 S. Ct. at 2052; see also Aparicio, 269 F.3d at 95.  In asserting these claims, the petitioner has the burden of overcoming the presumption that his counsel's representation was reasonable. See Strickland, 466 U.S. at 690, 104 S. Ct. at 2066 ("Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."); see also Aparicio, 269 F.3d at 95.

The Court rejects the argument that Petitioner's attorney was professionally unreasonable in failing to take mitigative steps such as challenging the amount of actual loss, or securing a guilty plea to another charge, like theft, that would have fallen within the same sentencing levels, but without the adverse immigration consequences resulting from the restitution amount. (See Pet'r Br., at 17-21.)   These claims are purely speculative.   Petitioner has not provided any evidence that the government would have been willing to consider an alternate plea, or sufficient evidence that defense counsel could have credibly argued that the loss amount should have been offset so that it did not exceed $10,000.   As such, Petitioner cannot overcome the presumption that counsel's representation was reasonable.

As a second ground for alleging ineffective assistance of counsel, Petitioner asserts that his attorney told him that he would not be deported because his sentence would only be for six months in prison. (See Lee Decl. ¶ 28.)   Petitioner contends that, had he been properly advised that he would be deported, he would not have pled guilty. (See id. ¶ 28.)   Defense counsel vehemently denies this, asserting that he told Petitioner that he could face immigration consequences, such as deportation. (See Brackley Decl. ¶¶ 4-6.)   Even accepting counsel's version of the events, Petitioner argues that, under United States v. Zhang, 401 F. Supp. 2d 233 (E.D.N.Y. 2005), the failure to inform Petitioner that his

22

sentence <u>would</u> — not <u>could</u> — result in deportation under the INA constituted an affirmative misrepresentation sufficient to establish that counsel's actions were objectively unreasonable. <u>See id.</u> at 242 (holding counsel's actions to be affirmative misrepresentation where defendant "was led to believe that deportation was only a possibility and only learned of the automatic nature of his deportation long after the time for a direct appeal had expired").[13]   Respondent argues that defense counsel's representation was competent and, in any event, Petitioner's claim is procedurally barred as a result of the Court's previous denial of Petitioner's ineffective assistance of counsel claim of significant similarity to the current claim. (See Resp't Opp. Br., at 25-28.)

Before addressing the merits, the Court takes a moment to note a procedural concern with Petitioner's claim.  Petitioner raised an ineffective assistance of counsel claim in May of 2000, seeking to vacate his plea because his attorney failed to warn him that his plea and conviction would likely result in his deportation. (See R & R, at 2.)   As this Court explained, Petitioner's claim was

---

[13] The <u>Zhang</u> court relied on the Second Circuit's ruling in <u>United States v. Cuoto</u>, 311 F.3d 179 (2d Cir. 2002), which held that "an affirmative misrepresentation by counsel as to the deportation consequences of a guilty plea is today objectively unreasonable," <u>id.</u> at 188, and characterized the level of certainty of deportation for aggravated felons as "automatic." <u>Id.</u> at 184.  <u>Zhang</u> is currently on appeal to the Second Circuit.

untimely in 2000 and, nevertheless, meritless. (See R & R.)
Petitioner now, rather creatively, reframes his attorney's
ineffective assistance as an affirmative misrepresentation instead
of a failure to warn, and seeks the seemingly more modest remedy of
reducing the restitution aspect of his sentence.   However, the
claim remains essentially the same — ineffective assistance of
counsel — and the remedy for the claim, if proven, would be vacatur
of the plea.    Thus, Petitioner seeks in effect to bring a
successive habeas petition through the vehicle of coram nobis.

Ultimately, the Court need not rule on procedural grounds.
Applying Strickland, even if Petitioner's counsel's actions were
deficient, Petitioner cannot establish that they were prejudicial.[14]
That is, in light of the discussion in Part I.A, supra, Petitioner
cannot establish that, but for Mr. Brackley's misrepresentation,
the restitution amount would have been less than $10,000.[15]

_____

[14] Were we to engage in a detailed analysis of whether Mr.
Brackley's representation was deficient, the Court would have to
consider his affidavit, where, rather curiously, he goes to great
lengths to avoid answering a fundamental question raised by
Petitioner — whether he knew at the time (and advised Petitioner)
that loss to the victim in excess of $10,000 on a fraud claim
constituted an aggravated felony under the INA, mandating
deportation.

[15] Under a plain error standard, applicable where the party
challenging the restitution order did not challenge the amount on
direct appeal, there is clearly no basis to reduce the
restitution in this case.   See Boyd, 222 F.3d at 49.   Even were
the Court to apply some lower standard of review, as a result of
Petitioner's counsel's deficient performance, the resulting
analysis would still operate within the framework of an
ineffective assistance of counsel claim, for which there must be

Petitioner has simply presented no competent evidence to support such a proposition.

Put another way, if Petitioner is correct that his counsel's actions constituted an affirmative misrepresentation, and, as he asserts, that he would not have pled guilty had he known he would face mandatory deportation proceedings, the proper relief would be to vacate Petitioner's plea because it would have been the result of ineffective assistance of counsel and it would not have been knowing and voluntary. See Cuoto, 311 F.3d at 187, 191 (vacating plea where court found petitioner's plea was rendered involuntary by counsel's ineffective assistance); see also Ventura v. Meachum, 957 F.2d 1048, 1058 (2d Cir. 1992) ("Ineffective assistance of counsel may render a guilty plea involuntary, and hence invalid."). However, Petitioner does not request such relief here. (See Am. Pet., at 1, 20; Pet'r Br., at 1, 35.)  Instead, Petitioner asks the Court to address his arguably constitutionally infirm plea by arbitrarily reducing his order of restitution.  The Court cannot oblige since, as Petitioner recognizes, the prejudice he would have suffered as a result of his counsel's misrepresentation would have been in agreeing to plead guilty, not in the Court's order of restitution.  Indeed, such a course is not only incongruous, but

---

a reasonable probability of a different outcome.  Again, a press release ambiguously noting that $2.1 million in water billings had been restored to customer accounts does not meet such a burden.

also forbidden, as it would violate the venerable doctrine of separation of powers. See Munroe v. Ashcroft, 353 F.3d 225, 227-28 (3d Cir. 2003) ("When a court vacates an otherwise final and valid conviction on equitable grounds merely to avoid the immigration-law consequences of the conviction, it usurps Congress's plenary power to set the terms and conditions of American citizenship and the executive's discretion to administer the immigration laws." (quoting Renteria-Gonzalez v. I.N.S., 322 F.3d 804, 812 (5th Cir. 2003))); Shaikh, 2006 WL 2347829 (same).

　　C.　Violation of Vienna Convention on Consular Relations

　　Petitioner's final argument in support of his Petition for a writ of coram nobis is that the government violated Article 36 of the VCCR, which requires "a host state to notify the consul of a foreign state when a national of that foreign state is arrested." Moyhernandez v. United States, No. O2 Civ. 8062 (MBM), 2004 WL 3035479, at *2 (S.D.N.Y. Dec. 29, 2004). Specifically, Petitioner argues that, had he been notified of his right to consular assistance, he would have realized that he was at risk of being deported and "sought assistance that would have better protected [him] against being deported to China." (See Pet'r Br., at 27; Lee Supp. Decl. ¶ 10.)　　Respondent argues that the VCCR is inapplicable, and, in any event, consular assistance would not have changed the outcome. (See Resp't Opp. Br., at 30-34.)

　　Petitioner's argument under the VCCR raises difficult

questions regarding whether its notification provisions create individual rights, under what circumstances relief may be granted for violations of the consular notification provisions, and whether the relief sought here is available in light of the Supreme Court's recent decision in Sanchez-Llamas v. Oregon, 126 S. Ct. 2669, 165 L. Ed. 2d 557 (2006), which held, in relevant part, that the application of the exclusionary rule to suppress a defendant's statements to police is not a judicial remedy available for violations of Article 36 of the VCCR. See Sanchez-Llamas, 126 S. Ct. at 2678-82; 164 L. Ed. 2d at 574-79.[16]  For similar reasons to those above, the Court need not address these issues here.

The Second Circuit has held that the Vienna Convention's consular notification provision does not create a "fundamental right" for foreign nationals. See Carbajal v. United States, No. 99 Civ. 1916 (MGC), 2004 WL 2283658, at *7 (S.D.N.Y. Oct. 8, 2004) (citing United States v. De La Pava, 268 F.3d 157, 165-66 (2d Cir. 2001)); Polanco v. United States, Nos. 99 Civ. 5739 & 94 Cr. 453 (CSH), 2000 WL 1072303, at *6 (S.D.N.Y. Aug. 3, 2000) ("[T]he Second Circuit has recognized that Article 36 [of the Vienna Convention] and its implementing regulations do not implicate fundamental constitutional or statutory rights.") (citing Waldron

---

[16] The Court in Sanchez-Llamas assumed, without deciding, that the VCCR creates judicially enforceable rights, but held in any event that suppression was not an appropriate remedy. See Sanchez-Llamas, 126 S. Ct. at 2678-82, 164 L. Ed. 2d at 574-79.

v. I.N.S., 17 F.3d 511, 518 (2d Cir. 1994)). And, where fundamental rights are not implicated, a challenged proceeding should only be invalidated upon a showing of prejudice. See Waldron, 17 F.3d at 518 (regarding regulation adopted to ensure compliance with VCCR, court held that "where an INS regulation does not affect fundamental rights . . ., we believe it is best to invalidate a challenged proceeding only upon a showing of prejudice . . . ."); cf. Iturralde-Manosalva v. Reno, No. 00 Civ. 9735 (BSJ), 2001 WL 1398689, at *2 (S.D.N.Y. Nov. 9, 2001) (relying on Waldron for proposition that "petitioner need not demonstrate prejudice where the INS violates a regulation intended to guard a fundamental right"). Again, because Petitioner is not seeking to invalidate his plea and has failed to demonstrate any basis for this Court to conclude that the $115,558 restitution figure was incorrect, let alone that it should be less than $10,000, Petitioner cannot establish prejudice based on the failure to provide consular notification, since it would not have altered the restitution determination that ultimately made him eligible for removal .

Similar to the problem with Petitioner's ineffective assistance of counsel claim, the Court is at a loss to understand how any violation of the United States' treaty obligations led to a faulty restitution determination. As an initial matter, even conceding Petitioner's point that the Supreme Court's ruling in Sanchez-Llamas left open the possibility of individually

enforceable rights under Article 36, it must also be noted that Sanchez-Llamas did not establish that there were necessarily any judicially enforceable rights under the Convention.   Instead, it merely held that, even assuming without deciding that the VCCR creates judicially enforceable rights, suppression of evidence is not one of them.  <u>See</u> <u>Sanchez-Llamas</u>, 126 S. Ct. at 2678-82.

Here, there is no correlation between a reduction in restitution and the failure to provide consular assistance.[17] Petitioner argues that, "had the Government fulfilled [its] duties, he would certainly have been on notice that he was being treated as a Chinese national," as opposed to a national of Hong Kong. (Pet'r Letter, at 4.)   Fair enough, but the Court does not see how Petitioner's understanding of whether he would be deported to China rather than Hong Kong has anything to do with the order of restitution.   Indeed, Petitioner had appointed counsel at his initial court appearance and concedes that, at that time, he was informed of the potential immigration consequences he faced. (See Lee Decl. ¶ 24.)   What additional advice the Chinese Consulate would have given him is unclear.  Even if the Court were to accept, for the sake of argument, that the absence of consular notification may have had some impact on whether Petitioner would have pled

---

[17] However, Petitioner's own argument is that such a correlation is crucial: "The kind of remedy sought, its relationship to the treaty violation, and its relationship to the actual harm caused are of utmost importance under the Supreme Court's reasoning in <u>Sanchez-Llamas</u>." (Pet'r Letter, at 3.)

guilty to the charges against him, once again, Petitioner does not request that the Court vacate his plea.  There is simply no link between the lack of consular assistance and the relief Petitioner seeks — an adjustment of the restitution amount imposed at his sentencing.

Because Petitioner has not established circumstances compelling an adjustment to Petitioner's restitution amount, his request for a writ of <u>coram</u> <u>nobis</u> should be denied.

II.  <u>Writ of Audita Querela</u>

A writ of <u>audita</u> <u>querela</u> is available "where there is a legal, as contrasted with an equitable, objection to a conviction that has arisen subsequent to the conviction and that is not redressable pursuant to another post-conviction remedy." See United States v. Persico, Nos. 99 Civ. 4291 & 84 Cr. 809 (JFK), 2000 WL 145750, at *5 (S.D.N.Y. Feb. 7, 2000) (quoting <u>United States v. LaPlante</u>, 57 F.3d 252, 253 (2d Cir. 1995)); <u>see also</u> <u>Vasquez v. United States</u>, No. 96 Civ. 2104 (PKL), 1999 WL 549004, at *4 (S.D.N.Y. July 28, 1999) (The writ "can only be invoked where there is a legal objection to a conviction, as opposed to an equitable one.") (citing <u>United States v. Tablie</u>, 166 F.3d 505, 507 (2d Cir. 1999)).

Petitioner presents the following legal objections to his conviction, which have arisen subsequent to his conviction: 1) based on the Supreme Court's rulings in <u>Blakely v. Washington</u>, 542 U.S. 296, 124 S. Ct. 2531 (2004), and United States v. Booker, 543

U.S. 220, 125 S. Ct. 738 (2005), holding that the Sixth Amendment requires that any fact that increases a defendant's maximum sentence must be pleaded to or found by a jury, Petitioner's restitution order is unconstitutional because it is based on facts not presented to a jury or admitted to by Petitioner at his plea hearing; and 2) the Second Circuit's ruling in United States v. Cuoto, 311 F.3d 179 (2d Cir. 2002), held that affirmative misrepresentations by counsel regarding immigration consequences of a guilty plea are objectively unreasonable. (See Pet'r Br., at 22.) These claims are meritless.

The Second Circuit has held that there is no Booker/Blakely problem with judicial factfinding as to the restitution amount. See Boccagna, 450 F.3d at 108-09 (attributing to United States v. Reifler, 446 F.3d 65 (2d Cir. 2006), the holding that "judicial factfinding relevant to an MVRA restitution order does not implicate Sixth Amendment rights"); see also United States v. Einstman, 325 F. Supp. 2d 373, 382 (S.D.N.Y. 2004). In addition, the Second Circuit has made clear that Booker is not retroactive on collateral review, where the conviction was final as of January 12, 2005. See Guzman v. United States, 404 F.3d 139 (2d Cir. 2005); see also Schultz v. United States, Nos. 05 Civ. 0246 & 01 Cr. 0638 (JSR), 2005 WL 1529698, at *1 (S.D.N.Y. June 28, 2005). As to Petitioner's claim under Cuoto, the Court has considered Petitioner's ineffective assistance of counsel claim, in support of

a writ of <u>coram</u> <u>nobis</u>, in light of <u>Cuoto</u>, and found it meritless. There is no reason to reconsider it under the auspices of an equally extraordinary writ. Accordingly, Petitioner's request for a writ of <u>audita</u> <u>querela</u> should be denied.

*          *          *

The Court is not unsympathetic to Petitioner's predicament. In the Court's opinion, to remove Petitioner from the country in which he has lived his entire adult life, and of which his parents, spouse, children and grandchildren are all citizens, to a country in which he has not set foot in over thirty years and has not maintained ties,[18] would be a draconian and senseless punishment under the circumstances. However, as a matter of law, without a sound legal basis to support his request to vacate or reduce the restitution amount, Petitioner asks the Court to arbitrarily reduce his restitution order out of personal sympathy, and, in effect, override not one, but two, legislative mandates — Congress's immigration provisions on the removability of noncitizens, and its restrictions on habeas corpus review. Such relief is beyond the Court's authority.

## CONCLUSION

For the reasons set forth above, the Court recommends that

---

[18] Petitioner suggests that he would likely be removed to mainland China, instead of Hong Kong. If that is the case, he faces the prospect of being deported to a country in which he has never set foot.

Petitioner's application for writs of coram nobis and audita querela be denied, and that this action be dismissed with prejudice.

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6(a) and (e). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Jed S. Rakoff, United States District Judge, and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be directed to Judge Rakoff. Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 812, 115 S. Ct. 86 (1994); Frank v. Johnson, 968 F. 2d 298, 300 (2d Cir.), cert. denied, 506 U.S. 1038, 113 S. Ct. 825 (1992); Small v. Secretary of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated: January 10, 2007
       New York, New York

33

Copies sent to:

Nancy Morawetz, Esq.
Washington Square Legal Services, Inc.
245 Sullivan Street, 6th Floor
New York, New York 10012

Rebecca  A. Monck, Esq.
Assistant United States Attorney
1 St. Andrew's Plaza
New York 10007